Jacob J. Schwartzwald, J.
This is a posttrial motion bf defendant to set aside the jury’s verdict as excessive. The jury rendered a verdict in favor of the plaintiffs in the sum of $85,000 as damages resulting from the wrongful death of a five-year-old boy, there being no cause of action for conscious pain and suffering. The decedent was survived by his 43-year-old father, his mother of the same age, and an 18-yoar-old sister. The father earns approximately $10,000 annually. The sister attends college. It was the hope and intent of the parents ultimately to send their son to medical school. It is evident from the size of the verdict that the jury found that the decedent was a bright youngster, with sound physical and mental characteristics and possessed of exceptional musical ability, who could reasonably be expected to be educated in private schools and colleges at his father’s expense.
Defendant asserts that the present verdict is excessive by comparison to other verdicts rendered in infant death actions. However, the test by comparison is not adequate. In affirming an award for $28,000 it was recently held: ‘ ‘ As to damages, while it might be said the amount is higher than under similar circumstances in some other case, we do not feel in the present day and age that the rule of comparison is the guiding one. The defendants in no way contradicted the testimony offered by the administratrix as to dependency and loss and under the circumstances we are unable to say that the amount of the verdict was so ‘ unconscionable ’ as to shock the conscience of the court. Accordingly, it should be affirmed. (Coleman v. Southwick, 9 Johns. 45.) ” (Malaspina v. Gilbert, 9 A D 842.)
Plaintiffs urge two principal arguments to the court to sustain the propriety of the jury’s award. One ground stated, that of the diminished purchasing power of the dollar, has the support of decisional authority. (See Filancia v. Town of Harrison, 4 AD 2d 876.)
Plaintiffs’ second and principal ground lacks the benefit of authoritative judicial support. Plaintiffs urge a complete breakdown with precedent by discarding, as the measure of damages, what they term the “ strict bookkeeping formula ”, that is, probable financial contributions from the infant less the cost of his maintenance. It is plaintiffs’ position that the “pecuniary” loss should be determined instead upon the basis of the infant’s measurable monetary value to his next of kin as an integral part of a functioning economic family unit.
Plaintiffs’ challenge to the propriety of continuing to measure damages as heretofore, in cases of infants’ wrongful deaths, requires an examination of the present existing law.
*1033 It is not questioned what the applicable principle is that has lpng been established in this State. The rule was summarized in Keenan v. Brooklyn City. R. R. Co. (145 N. Y. 348, 350-351): “ The jury, in determining the amount of damages that should be awarded, was in duty bound to consider the various elements of pecuniary loss sustained by the father. First, the probable earnings of the son during his minority over and above his support, clothing and education; next, the probability of his living and becoming of sufficient ability to support his father in case of his becoming aged, poor and unable to support himself; and then they had the right to consider the amount he would have brought to his next of kin while living and their prospect of inheriting from him after death.”
The speculative nature of the problem of determining damages had prior thereto been recognized by the court in Ihl v. Forty-Second St., etc. R. R. Co. (47 N. Y. 317, 321) in the following language: “It was within the province of the jury, who had before them the parents, their position in life, the occupation of the father, and the age and sex of the child, to form an estimate of the damages with reference to the pecuniary injury, present or prospective, resulting to the next of kin. Except in very rare instances, it would be impractical to furnish direct evidence of any specific loss occasioned by the death of a child of such tender years; and to hold that, without such proof, the plaintiff could not recover, would, in effect, render the statute nugatory in most cases of this description. It cannot be said, as a matter of law, that there is no pecuniary damage in such a case, or that the expense of maintaining and educating the child would necessarily exceed any pecuniary advantage which the parents could have derived from his services had he lived. These calculations are for the jury, and any evidence on the subject, beyond the age and sex of the child, the circumstances and condition in life of the parents, or other facts existing at the time of the death or trial, would necessarily be speculative and hypothetical, and would not aid the jury in arriving at a conclusion.”
Soon after the passage of the wrongful death statute it was held that the Legislature intended “ that the jury * * * should give such a compensation as they should deem fair and just, keeping in view that it was to be measured by the injury done to the next of kin. They, were not to compensate for the pain and suffering endured by the deceased * * * but were to measure the compensation by the pecuniary injury exclusively, the statute assuming that every person possesses some relative value to others.” (Oldfield v. New York & Harlem R. R. *1034 Co., 14 N. Y. 310, 318.) In Schafer v. Baker Transfer Co., (29 App. Div. 459, 461), it was held that: “For the death of a minor child the parent recovers the value of the child’s services during his minority, less the expense of his support. The plaintiff here, the father, was employed as a driver, and the boy was of a tender age. What it would cost the father to provide for and educate the boy must be deducted from the earning capacity of the boy until his majority.”
Historically, it must be recalled that under the common law no action was provided for the tortious death of a human being. (See Prosser, Law of Torts [2d ed.], p. 710.) It was not until 1846 when statutory relief was afforded in England by the passage of Lord Campbell’s Act (see 16 Am. Jur., Death, p. 39). The first American wrongful death statute, a counterpart of Lord Campbell’s Act, was adopted in this State one year later (see 20 Carmody-Wait, New York Practice, p. 435). It is the theory of the .statute ‘ ‘ that damages should be recovered for injuries to the estate of the beneficiaries of the action, which injuries were caused by the death of the decedent. The beneficiaries named in the statute sustain such a legal relation to the deceased by blood or marriage that it is presumed that they would have been pecuniarily benefited by his continuance in life ”. (Matter of Meekin v. Brooklyn Hgts. R. R. Co., 164 N. Y. 145,148.)
The courts in other jurisdictions are recognizing the merit of plaintiffs’ position in seeking a rejection of the wage-profit capability of the infant decedent as the standard. In fact, in a recent decision of the Supreme Court of the State of Michigan, having a Lord Campbell type of statute, the principle of the child-labor standard of pecuniary loss (wages less cost of his upkeep) was re-examined and specifically overruled (Wycko v. Gnodtke, 361 Mich. 331). It was the majority view of the Michigan court that the pecuniary loss provision of the wrongful death statute had been interpreted in earlier decisions against a background of social-economic conditions prevailing during the latter half of the Nineteenth Century. Of paramount impact upon the thinking of the courts in that era was the generally accepted attitude of the day which unabashedly condoned the exploitation of the labor of infant children. The Michigan court reasoned that, as the appalling child-labor conditions referred to have since been abolished and would today no longer be tolerated, the rule which measures the pecuniary value of a child’s life by former, now nonexisting, standards should cease to be applied.
*1035 In the Wycko case (supra) the court made an exhaustive study of this question of damages for the wrongful death of a child. Judge Smith, speaking for the majority of the court (p. 333) said: “we come once more to a consideration of the problem of the ‘ pecuniary loss ’ suffered by the parents of a deceased minor child. What we in Michigan have done, in common with many other courts, is to require the subtraction, from the hypothetical earnings of the child prior to his majority, the speculative costs of his rearing. The difference, if any, we say is the parents’ pecuniary loss.” The precedents establishing this child-labor measure of damages for the death of a child derived from “ an era when ample work could be found for the agile bodies and nimble fingers of small children ” (p. 335). It was a period when atrocities were visited upon boys and girls apprenticed to factory owners, and forms “ one of the darkest chapters in the history of childhood. # s * It is not surprising that the courts of such a society should have read into the statutory words ‘ such damages as they [thé jury] may think proportional to the injury resulting from such death ’ not only the requirement of a pecuniary loss, but, moreover, a pecuniary loss established by a wage benefit-less-costs measure of damages. Other losses were unreal and intangible and at this time in our legal history the courts would have no truck with what Chief Baron Pollock termed in Duckworth, supra, [4 II. & N. 653] ‘ imaginary losses.’ Loss meant only money loss, and money loss from the death of a child meant only his lost wages. All else was imaginary. The only reality was the King’s shilling. That this barbarous concept of the pecuniary loss to a parent from the death of his child should control our decisions today is a reproach to justice ” (pp. 336-337).
In other areas of the law the century-old statutes have been repealed, abolished or changed by case law. “ Yet there still exists in the law this remote and repulsive backwash of time and civilization, untouched by the onward march of society, where precedents we alone honor tell us that the value of the life of a child must be measured solely by the standards of the day when he peddled the skill of his hands and the strength of his back at the factory gates.” (Wycko, supra pp. 337-338.)
The Michigan court, reaching its conclusion, said (p. 338): “ we now reject, as prayed, by appellant, the child-labor measure of the pecuniary loss suffered through the death of a minor child, namely, his probable wages less the cost of his keep, and all cases consistent therewith we now overrule.”
Judge Smith, after reaching the above conclusion, then seeks to lay down what he considers a modern-day rule (pp. 338-340):
*1036 “What, then, is the pecuniary loss suffered because of the taking of-the child’s life? It is the pecuniary value of the life. We are aware, of course, that there are those who say that the life of a human being is impossible to value, that although we will grapple mightily with the value of the life of a horse, of a team of mules, we will stand aloof where a human is concerned and assign it no value whatever. * * * In the cases coming to us a life has been taken and it is our duty, as best we can, to put a fair valuation on it. In so doing, we will keep in mind that the act is remedial in its character and our duty is to construe it liberally in favor of the beneficiaries.
“The pecuniary value of a human life is a compound of many elements. 0 * * we must consider the expenses of birth, of food, of clothing, of medicines, of instruction, of nurture and shelter. * * * an individual member of a family has a value to others as part of a functioning social and economic unit. This value is the value of mutual society and protection, in a word, companionship. The human companionship thus afforded has a value and its loss forms a part of the ‘ value ’ of the life we seek to ascertain. ’ ’
As has heretofore been noted by the above New York cited cases, the applicable measure of damages in this jurisdiction has been well established. Recovery can only be had for pecuniary damages. Excluded from consideration are such items as mental anguish, grief, sorrow, sentiment, or even loss of companionship. The theoretical rule to be applied in particular to infants of tender years involved a consideration of the parents’ right to his earnings during minority and the possibility of receiving-further contributions during* later life. From such total must be deducted the cost of rearing the infant to his majority. Making- the necessary computation presents “ a problem that is in a large part theoretical and somewhat nebulous ” which “ must be left to the good sense of the jury.” (Reed v. Gulf Oil Corp., 217 F. Supp. 370, 372.)
Accordingly, it cannot be reasonably disputed that the “ net loss ” figure reached, after deducting the expenses of raising a child of tender years, “would almost always result in a minus figure ” (Hoyt v. United States, 286 F. 2d 356, 361) and in effect would serve to nullify the primary purpose of the New York statute to provide “ a fair and just compensation for the pecuniary injuries ” (Decedent Estate Law, § 132). Assuming- such a result, of a minus figure, it could hardly be properly maintained that the New York State Legislature, which was the first to blaze the trail for justice for the injured and always in the vanguard of liberal and enlightened legislation, had *1037 intended its now century-old enactment to become a useless, ineffective statute serving to aid the offender rather than the injured. Our present generation has succeeded in raising to a high level the social and economic standards which daily affect the health and education of the present-day child. No longer can the labor of a child be exploited without committing a violation of law. There are also compulsory school attendance laws whose aims it is to assure the child at least a minimum of education. Children in greater numbers pursue advanced studies in colleges at considerable expense to themselves and their parents and with the aid of public and private scholarships. Just recently a movement has been commenced for the purpose of assuring each child attendance at college for at least two years. Those are the conditions existing today. The child breadwinner of the past remains solely as an historical item rather than a way of life.
However much this court desires to effect the change, in accordance with the decision in the Wycko case, to compensate the present-day child-rearing parents for their financial sacrifices, rooted in their loving respect for the human dignity of the infant’s life, and similarly to modify the requirement which deducts the cost of maintenance of the child during minority, it is nevertheless bound by the doctrine of stare decisis to apply the law as it presently exists in this State. It is the hope of the court that this decision will alert our State legislators and our law revision agencies to the inadequacy of the statute so that they may again blaze the trail in liberal and advanced legislation as they did in yesteryear, thereby providing a proper remedy through the enactment of a fair and just measure of damages in the case of the wrongful death of an infant.
The court is constrained to hold, therefore, under our present laws, that the verdict of $85,000' is excessive. The motion to set aside the verdict and for a new trial on the ground of excessiveness is granted only to the extent of ordering a trial solely on the issue of damages (CPLR 4404, subd. [a]) unless plaintiffs stipulate to reduce the verdict to the sum of $24,741.70 within 10 days after service of the order herein with notice of entry.