CHRISTOPHER REALE, by His Mother and Natural Guardian, VIRGINIA REALE, et al., Plaintiffs, v HERCO, INC., et al., Defendants.

HERCO, INC., Third-Party Plaintiff, v GAMETIME, INC., Third-Party Defendant.

HERCO, INC., Fourth-Party Plaintiff-Appellant, v VIRGINIA REALE, Fourth-Party Defendant-Respondent.

Second Department, October 26, 1992

APPEARANCES OF COUNSEL

*Way & White,* Jericho *(Camille Nieves* and *James E. Mc-Elhone* of counsel), for fourth-party plaintiff-appellant.

*Devitt & Spellman,* Smithtown *(L. Kevin Sheridan* of counsel), for fourth-party defendant-respondent.

## OPINION OF THE COURT

BALLETTA, J.

On August 25, 1983, the infant plaintiff, Christopher Reale, was injured when he fell from a slide at Hershey High Meadow Camp, which is located in Hershey, Pennsylvania, and which is owned and operated by the appellant Herco, Inc. (hereinafter Herco), a corporation domiciled in Pennsylvania. The infant plaintiff and his mother, the plaintiff Virginia Reale, are residents of New York.

The plaintiffs commenced the instant action alleging, *inter alia,* that as a result of Herco's negligence, the infant plaintiff sustained injuries when he fell from a slide at the camp. Herco subsequently instituted a fourth-party action against the infant's mother, Virginia Reale, alleging that she was responsible in whole or in part for the infant's injuries for failure to provide proper parental supervision. This fourth-party claim was based on Pennsylvania law, which permits an

alleged tortfeasor to seek contribution from a parent for negligent supervision *(see, Miller v Leljedal,* 71 Pa Commw 372, 455 A2d 256). In the order appealed from, the Supreme Court granted the mother's motion to dismiss the fourth-party complaint, stating that New York law, which does not recognize a cause of action to recover damages for negligent parental supervision, was applicable under New York choice-of-law rules.

The issue in this case involves a conflict between the laws of New York and the laws of Pennsylvania. The question of which State's law should apply in this negligence action involving a tort allegedly committed in Pennsylvania by a domiciliary of Pennsylvania, injuring the infant plaintiff, who is domiciled in New York, must be resolved in favor of Pennsylvania law. We hold that Pennsylvania law, which allows a cause of action to recover damages for negligent parental supervision, should govern in the instant case.

Traditionally, New York courts resolved choice of law conflicts in tort cases by applying the law of the place of the alleged wrong (the *lex loci delecti* rule). However, in *Babcock v Jackson* (12 NY2d 473, 479), the Court of Appeals moved away from the mechanical application of the *lex loci delicti* rule and employed a "center of gravity" or "grouping of contacts" test in a situation where codomiciliaries of New York were involved in a car accident in Ontario. The Court of Appeals refused to apply Ontario's guest statute, which would have barred the plaintiff's action against the defendant host driver, holding that New York's interests in enforcing its rules governing recovery of damages for admitted wrongs were paramount. In so doing, the Court stated that "[j]ustice, fairness and 'the best practical result' may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation" *(Babcock v Johnson, supra,* at 481).

Following *Babcock (supra),* New York choice-of-law theory continued to undergo refinement *(see, e.g., Dym v Gordon,* 16 NY2d 120; *Tooker v Lopez,* 24 NY2d 569; *Miller v Miller,* 22 NY2d 12; *see generally,* Korn, *The Choice-of-Law Revolution: A Critique,* 83 Colum L R 772; *Feldman v Acapulco Princess Hotel,* 137 Misc 2d 878). Then, in *Neumeier v Kuehner* (31 NY2d 121), the Court of Appeals was presented with a split-domicile case. In *Neumeier,* the guest, a domiciliary of Ontario, was killed when the car in which he was a passenger

collided with a train in Ontario. In holding that Ontario's guest statute applied to the suit against the driver, a New York domiciliary, the Court thought it important that the guest, for whose death recovery was sought, was domiciled in Ontario, Ontario was the place of the accident, and Ontario was the very jurisdiction which had enacted the statute designed to protect the host from liability for ordinary negligence *(see, Neumeier v Kuehner, supra,* at 125).

Chief Judge Fuld, who wrote the opinion in *Neumeier v Kuehner (supra,* at 127), adopted three choices-of-law rules for resolving conflicts "in order to assure a greater degree of predictability and uniformity". These rules had originally been suggested by Chief Judge Fuld in his concurring opinion in *Tooker v Lopez (supra).* The third rule, which is of particular relevance to the case at bar, is as follows: "3. In other situations, when the passenger and the driver are domiciled in different states, the rule is necessarily less categorical. Normally, the applicable rule of decision will be that of the state where the accident occurred but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants" *(Neumeier v Kuehner, supra,* at 128).

The Court of Appeals again reviewed the choice-of-law rules in *Schultz v Boy Scouts* (65 NY2d 189). In *Schultz,* the infant plaintiffs (domiciliaries of New Jersey) brought suit in New York against the Boy Scouts of America (domiciled in New Jersey) and the Franciscan Brothers of the Poor (domiciled in Ohio) for personal injuries arising out of sexual abuse by a troop leader that occurred at a Boy Scout camp in New York. The issue faced by the Court was whether to apply New Jersey law, which had a charitable immunity statute, or New York law, which would have permitted suit against the defendant charities (no issue was raised as to the applicability of Ohio law).

The *Schultz* Court initially noted that New York followed an interest analysis approach to conflict-of-law problems, stating that "the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort" *(Schultz v Boy Scouts, supra,* at 197). The Court applied the third *Neumeier* rule to the cause of action against the Franciscan Brothers "because the parties are domiciled in different jurisdictions with conflicting loss-distribution rules and the locus of the tort is New York, a separate jurisdiction" *(Schultz v Boy Scouts,*

*supra,* at 201). Although it recognized that the law of the place of the tort would normally apply, the Court concluded that the defendants had met their burden in showing that New Jersey law was the applicable law under the "special circumstances" exception to the third *Neumeier* rule. In particular, the Court found that: "application of the law of New Jersey * * * would further that State's interest in enforcing the decision of its domiciliaries to accept the burdens as well as the benefits of that State's loss-distribution tort rules and its interest in promoting the continuation and expansion of defendant's charitable activities in that State * * * [and] application of New Jersey law will enhance 'the smooth working of the multi-state system' by actually reducing the incentive for forum shopping and it will provide certainty for the litigants whose only reasonable expectation surely would have been that the law of the jurisdiction where plaintiffs are domiciled and defendant sends its teachers would apply, not the law of New York where the parties had only isolated and infrequent contacts as a result of [the defendant teacher's] position as a Boy Scout leader" *(Schultz v Boy Scouts, supra,* at 201-202).

It should be noted that the *Schultz* Court held that New Jersey law was applicable despite the public policy doctrine under which a forum may refuse to apply a portion of foreign law that would otherwise be applicable because it is contrary or repugnant to its State's own public policy. In order to come within the public policy exception, the proponent must not only establish that the foreign law is contrary to New York public policy, but he or she must also establish that there are enough important contacts between the two parties, the occurrence, and the New York forum to implicate New York's public policy and to preclude enforcement of the foreign law. The proponent must then show that enforcement of the foreign law " 'would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal' expressed in them" *(Schultz v Boy Scouts, supra,* at 202, quoting from *Loucks v Standard Oil Co.,* 224 NY 99, 111; *see also, Rakaric v Croatian Cultural Club,* 76 AD2d 619; *Scharfman v National Jewish Hosp. & Research Ctr.,* 122 AD2d 939). The Court concluded that there were insufficient contacts between New York, the parties, and the transactions involved to implicate New York's public policy which would call for its enforcement.

Following the *Babcock (supra), Neumeier (supra),* and

*Schultz (supra)* line of cases, we must identify the particular law in conflict and determine which contacts are significant in defining State interests. In a split-domicile case, as in the instant case, a court should apply the third *Neumeier* rule, and, if it finds that the foreign law applies under the *Neumeier* interest-analysis test, then the public policy doctrine may be invoked, provided there are sufficient contacts between the locus State and the litigation.

In the case at bar, the particular law in conflict is the availability of a cause of action to recover damages for negligent parental supervision. Under New York law, a parent's alleged negligent failure to supervise his or her child is not recognized as a tort actionable by the child *(see, Holodook v Spencer,* 36 NY2d 35), and, therefore, a third party may not seek contribution from the infant's parents on this basis *(see, Parsons v Wham-O, Inc.,* 150 AD2d 435; *Russo v Osofsky,* 112 AD2d 926). In *Holodook v Spencer (supra,* at 47), the Court expressed concern that a parent's failure to provide adequate supervision should not be permitted to diminish or bar a child's recovery against a third party: "It is artificial to separate the parent and child as economic entities by the assertion that the recovery of the nonparent defendant from the negligent parent does not technically diminish the injured child's recovery. The reality of the family is that, except in cases of great wealth, it is a single economic unit and recovery by a third party against the parent ultimately diminishes the value of the child's recovery. Even if scrupulous care were taken to see that [the parent's contribution] did not come out of the child's recovery * * * there would still be a strain on the family relationship, a result which our courts consistently sought to avoid".

Under Pennsylvania law, on the other hand, negligent supervision of a minor by a parent is cognizable as a cause of action. In *Miller v Leljedal* (71 Pa Commw 372, 378-379, 455 A2d 256, 258-259), the *Holodook (supra)* case was distinguished: "In Pennsylvania, however, the situation differs from that facing the New York Court of Appeals in *Holodook* in two key respects. First, notwithstanding the common pleas court holding to the contrary, *Falco [v Pados,* 444 Pa 372, 282 A2d 351], in abrogating parent-child tort immunity, did so without qualification, unlike the New York court in *Gelbman [v Gelbman,* 23 NY2d 434] or the Wisconsin court in *Goller v White* [20 Wis2d 404, 122 NW2d 193]. This is best evidenced by the statement in *Falco* that 'the doctrine of parental

immunity has no rational purpose today, and henceforth will not be recognized in Pennsylvania' *[supra,* 444 Pa, at 376, 282 A2d, at 353] * * * Secondly, recognizing a child's right to sue, or a tortfeasor's right to seek contribution from a parent for negligent supervision, is not creating a liability where none previously existed. It has long been the law in Pennsylvania that parents have a duty to exercise reasonable care to protect their children and keep them from danger [citing *Goldberg v Philadelphia R. T. Co.,* 299 Pa 79, 149 A 104]".

In light of this clear division in the law, a "true conflict" exists, since the application of the New York law would undermine Pennsylvania's interests, while application of the Pennsylvania law would undermine New York's interest. Therefore, the next step in determining which State's laws apply is the application of the third *Neumeier* rule. It is readily apparent that under the first part of the rule, Pennsylvania law would apply, since the law of the locus jurisdiction would be applied unless special circumstances exist which would warrant a departure from the *lex loci delicti* rule. It becomes necessary, therefore, to determine which State has the greatest interest in the litigation.

In this regard, the plaintiffs contend that New York's interest in regulating the parent-child relationship is the superior interest, while Herco argues that Pennsylvania's interest in regulating the business relationship between Herco and the camp visitors dominates. We agree that Pennsylvania's interest in protecting the reasonable expectations of Herco and the visitors to its camp with respect to their duties and obligations toward each other should be the focus of the interest-analysis test because it is those relationships from which the original cause of action arose. Therefore, it is those relationships which are central to this litigation *(see generally, Weisberg v Layne-N. Y. Co.,* 132 AD2d 550).

In *Hotaling v Smith* (63 AD2d 219), the Appellate Division, Third Department, was faced with a similar conflict of laws scenario when the infant plaintiff (a New York domiciliary) sued after he was injured during a camping trip with his parents in Nova Scotia, Canada. The defendant owners of the campsite (domiciliaries of Nova Scotia) cross-claimed, alleging that under the laws of Nova Scotia, the parents had a duty to supervise and control the infant's activities. Holding that Nova Scotia law would govern, the Third Department, relying on *Babcock v Jackson (supra)* and related cases, found the following contacts with Nova Scotia to be significant: " 'The

accident occurred there; the defendants * * * were domiciled there, conducting their business and campsites, to which [the plaintiff and his parents] repaired for a vacation stay at a fixed place; thus differing from the many motor vehicle cases where the place of the accident, often along the route of a multi-state journey, was entirely fortuitous. Significant, too, and of great concern to Nova Scotia, and, perhaps, to its economic interest in tourism and travel, are the rights accorded by its laws to the owners and occupiers, permanent and transient, of the lands within its borders' " *(Hotaling v Smith, supra,* at 221).

The Third Department found that Nova Scotia law applied because of its greater interest in regulating the business relationship between the infant plaintiff and the defendant campsite owner.

The United States Court of Appeals for the Second Circuit followed *Hotaling (supra)* in *Bader v Purdom* (841 F2d 38). In *Bader,* while the infant plaintiff and her family (all New York residents) were visiting the defendants at their home in Ontario, Canada, she was bitten by a dog owned by the defendants. The infant plaintiff sued to recover damages for negligence, and the defendants brought a third-party complaint against the infant plaintiff's parents for negligent supervision. In denying the parents' motion to dismiss the third-party complaint, the Second Circuit applied the interest analysis test employed in *Schultz v Boy Scouts (supra)* and *Hotaling v Smith (supra)* and held that the Ontario Dog Owner's Liability Act, which held dog owners strictly liable for injuries caused by their dogs but allowed dog owners to seek contribution from those who contributed to the damages, was the appropriate law governing the action because " 'special circumstances' [did not] warrant a departure from the *lex loci delicti* rule" *(Bader v Purdom, supra,* at 40; *see also, Cameron v G & H Steel Serv.,* 494 F Supp 171).

In light of the factual similarities between the *Hotaling (supra)* and *Bader (supra)* cases with the case at bar, and following the reasoning behind the *Babcock (supra)* line of cases, it is apparent that no "special circumstances" warrant a departure from the locus jurisdiction rule in *Neumeier.* Therefore, Pennsylvania law allowing a cause of action sounding in negligent parental supervision is the appropriate law to be applied under the interest-analysis test. We find that Pennsylvania's loss allocation rule allowing a negligent parental supervision suit, which directly relates to its interest in

regulating the conduct between Herco and the infant plaintiff within its borders, is superior in this instance to New York's interest in the parent-child relationship which is not the relationship central to this litigation.

Since, under the third *Neumeier* rule, Pennsylvania law is the appropriate choice, the next issue is whether the instant facts properly invoke the public policy exception. As noted, New York law invokes the public policy exception where the proponent first shows that (1) sufficient contacts exist between the parties, the occurrence, and New York, and (2) enforcing the foreign law would violate some fundamental principle of justice *(see, Schultz v Boy Scouts, supra,* at 202-203).

In this case, the plaintiffs have not shown that the place of the infant's injury was merely fortuitous, which would result in a diminishing of Pennsylvania's contacts with the occurrence of the injury, thereby implicating the public policy doctrine *(see, Babcock v Johnson, supra; Kilberg v Northeast Airlines,* 9 NY2d 34). For example, in *Suliao Zhou Huang v Lee* (734 F Supp 71), the New York decedent was accidently killed by carbon monoxide poisoning while spending the night at his uncle's home in New Jersey. Holding that New Jersey governed the standard of care owed to the decedent, the court found that the situs of the injury was not merely fortuitous: "To determine whether or not the situs of the injury was fortuitous, New York courts have '[t]raditionally * * * distinguished fixed location from transient (fortuitous) cases * * * and in fixed cases, they often place greater emphasis on the law of the situs of the tort' * * * This is not a case in which the place of the wrong is purely fortuitous. Unlike the airplane or automobile passenger, whose relationship with the state in which the injury occurs may be very tenuous, Huang, sleeping bag in tow, crossed the Hudson River, into New Jersey, for the specific purpose of spending the night at the Defendant's home. He had a very direct and substantial nexus with New Jersey" *(Suliao Zhou Huang v Lee, supra,* at 73).

As in *Suliao Zhou Huang v Lee (supra),* the infant plaintiff herein voluntarily went to Pennsylvania for the specific purpose of spending a vacation in Hershey Park and, thus, "he had a very direct and substantial nexus with [Pennsylvania]" *(Suliao Zhou Huang v Lee, supra,* at 72; *see also, Gray v Busch Entertainment Corp.,* 886 F2d 14, 15 [that a vacationing New York resident was injured at an amusement park in Virginia was not fortuitous, and Virginia law would be applicable]; *Hotaling v Smith, supra,* at 221).

On the other hand, we find that Herco's contacts with New York are too insufficient in this case to constitute the "significant contacts" necessary to implicate the public policy doctrine. The injury occurred in Pennsylvania, Herco is domiciled in Pennsylvania, and the plaintiffs voluntarily entered and vacationed in Pennsylvania *(see, Bader v Purdom, supra,* at 40-41; *also, Barkanic v General Admin.,* 923 F2d 957; *cf., Scharfman v National Jewish Hosp. & Research Ctr., supra; Rakaric v Croatian Cultural Club, supra).* In *Bader v Purdom (supra),* the United States Court of Appeals for the Second Circuit held that its decision allowing a negligent parental supervision suit under Ontario law would not be altered by the application of the public policy doctrine because allowing the suit would not violate the fundamental principle of justice standard as articulated in *Schultz v Boy Scouts (supra).* The court noted that the New York domiciliaries voluntarily entered and vacationed in Ontario and that the allegedly tortious conduct occurred in Ontario *(see also, Gray v Busch Entertainment Corp., supra* [Virginia's contributory negligence law applied where a New York resident was injured at an amusement park located in Virginia, the court reasoning that no special circumstances warranted departure from the law where the injury occurred and the plaintiff did not meet the heavy burden required by the public policy doctrine]).

This Court's ruling in *Scharfman v National Jewish Hosp. & Research Ctr., supra),* which found New York law applicable under the public policy exception, is distinguishable from the case at bar. Relying on *Rakaric v Croatian Cultural Club (supra),* a case which had involved the New Jersey charitable immunity statute, the *Scharfman* Court held that Colorado's statute immunizing the defendant hospital from suit for the negligence of a physician employed by it did not apply to a New York plaintiff because New York had a superior interest in protecting its residents from the unfair or anachronistic Colorado statute. In explanation, this Court stated the following:

"Here, as in *Babcock,* 'New York had an important interest in protecting its own residents injured in a foreign State against unfair or anachronistic statutes of that State' *(Schultz v Boy Scouts of Am., supra,* at p 199). We have previously applied this rule in a case involving a charitable immunity statute. In *Rakaric v Croatian Cultural Club* (76 AD2d 619, *appeal dismissed* 52 NY2d 1072), the parties were all New York residents, but the injury occurred in New Jersey which

had a charitable immunity statute barring recovery. We found that the law of New York, the State of common domicile, was applicable rather than New Jersey, the law of the situs, because of the 'prevalence of the greater number of contacts with New York * * * coupled with the alternative of having to apply a rejected and archaic principle of charitable immunity under which an infant resident of New York will be left without legal recourse' *(Rakaric v Croatian Cultural Club, supra,* at p 633). While we are not dealing with a charitable immunity statute, this case concerns New York residents facing a Colorado law which immunizes a hospital for the negligence of its employees, a doctrine contrary to the common law of this State.

"In the case at bar, we find that the plaintiff's New York residency and the defendant's activities conducted from a New York office which screens potential patients, constitute significant contacts, and that New York has a significant interest in protecting its residents from Colorado's hospital quasi-immunity law which would bar recovery *(see, Rakaric v Croatian Cultural Club, supra; cf. Schultz v Boy Scouts, supra,* at p 199). We therefore hold that New York law is applicable and affirm the denial of that branch of the defendant's motion which was for summary judgment dismissing the personal injury cause of action" *(Scharfman v National Jewish Hosp., supra,* at 940-941).

Thus, in *Scharfman (supra)* and in *Rakaric (supra),* foreign immunity statutes were not applied because to do so would have barred any recovery by a New York resident plaintiff. In the instant case, however, allowing a suit to recover damages for negligent parental supervision would only affect the allocation of the loss between the responsible parties. Although the concern expressed in *Holodook v Spencer (supra)* regarding the diminished recovery of the child is a real one, this concern does not rise to the "unfair or anachronistic" standard as articulated in *Schultz (supra,* at 199) *(see, Bader v Purdom, supra).* Since the infant plaintiff will not be left without legal recourse if Herco is permitted to bring a negligent parental supervision action and the infant plaintiff's mother has not shown that she would be subjected to "unfair or anachronistic treatment" if Pennsylvania law were applied, the public policy doctrine does not change the result favoring Pennsylvania law under an interest-analysis test.

Moreover, contrary to the plaintiffs' contention that Pennsylvania is out of touch with the latest thinking on the

parental immunity issue, the States have taken a wide range of approaches regarding the issues of parental immunity and third-person contribution suits. For example, some States hold that a tortfeasor is entitled to recover contribution from a joint tortfeasor who is the parent of the injured child, even though, under controlling State law, a parent could not be sued by the injured child *(see, Chinos Villas v Bermudez,* 448 So 2d 1179 [Fla]; *Moon v Thompson,* 127 Ill App 3d 657, 469 NE2d 365). Further, many States have completely abrogated parental immunity *(see, Petersen v City & County of Honolulu,* 51 Haw 484, 462 P2d 1007; *Rupert v Stienne,* 90 Nev 397, 528 P2d 1013; *Carey v Meijer, Inc.,* 160 Mich App 461, 408 NW2d 478; *Elam v Elam,* 275 SC 132, 268 SE2d 109), while other States have recognized limited exceptions to the parental immunity doctrine *(see, Nolechek v Gesuale,* 46 NY2d 332 [negligent entrustment of a dangerous instrument]; *Pullen v Novak,* 169 Neb 211, 99 NW2d 16 [immunity except where brutal, cruel, or inhuman treatment]; *Attwood v Estate of Attwood,* 276 Ark 230, 633 SW2d 366 [willful torts, i.e., driving while intoxicated]).

Thus, we find that, under the proper application of the third *Neumeier* rule, Pennsylvania law should apply in this case. Accordingly, the order is reversed, on the law, with costs, and the motion to dismiss the fourth-party complaint is denied.

SULLIVAN, J. P., HARWOOD and EIBER, JJ., concur.

Ordered that the order is reversed, on the law, with costs, and the motion to dismiss the fourth-party complaint is denied.